JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------- X

MASTR Asset Backed Securities Trust 2007-
WMC1, by U.S. BANK NATIONAL
ASSOCIATION, solely in its capacity as the
trustee pursuant to a Pooling and Servicing
Agreement, dated as of February 1, 2007,

                              Plaintiff,

        v.

WMC MORTGAGE  LLC, f/k/a
WMC MORTGAGE CORP.,

                              Defendant.
------------------------------------------- X

12 CV 3575

**COMPLAINT**

__ Civ. _____

Plaintiff MASTR Asset Backed Securities Trust 2007-WMC1 (the "Trust"), by U.S.

Bank National Association, solely in its capacity as the trustee ("U.S. Bank" or the "Trustee") for

the holders of, and at the direction of certain holders of, Mortgage Pass-Through Certificates

Series 2007-WMC1 (the "Certificates") issued by the Trust, as and for its complaint against

defendant WMC Mortgage LLC, f/k/a WMC Mortgage Corp. ("WMC" or "Defendant"), states

and alleges as follows:

**Preliminary Statement**

1.      This is an action for breach of contract and indemnification arising out of the

failure by WMC to comply with its unambiguous contractual obligations under a series of

integrated agreements to repurchase defective loans from a pool of residential mortgage loans

(the "Loans") that it originated and ultimately sold for approximately $900 million.

2.      WMC sold the mortgage loans to UBS Real Estate Securities, Inc. ("UBS")

pursuant to the Amended and Restated Master Seller's Purchase and Warranties Agreement (the

"Purchase Agreement"), dated December 1, 2005.  (A true and correct copy of the Purchase

Agreement is attached hereto as Exhibit A)  In turn, UBS sold the Loans and assigned all of its

rights under the Purchase Agreement to Mortgage Asset Securitization Transactions, Inc.

("MASTR" or the "Depositor") pursuant to the Assignment and Recognition Agreement (the

"Assignment Agreement"), dated February 27, 2007.  (A true and correct copy of the

Assignment Agreement is attached hereto as Exhibit B)  MASTR then deposited the Loans into

the Trust, and the Loans were securitized through the issuance by the Trust of the Certificates

using the Loans as collateral (the "Securitization") pursuant to the Pooling and Servicing

Agreement (the "PSA"), dated as of February 1, 2007.  (A true and correct copy of the PSA is

attached hereto as Exhibit C)

3.      In connection with the sale of the Loans to UBS, WMC made approximately 80

representations and warranties ("Representations and Warranties") regarding the agreed-upon

characteristics and quality of each Loan.  The Representations and Warranties included, among

many others, specific representations and warranties that (a) "[n]o fraud, error,

misrepresentation, gross negligence or similar occurrence with respect to a Mortgage Loan has

taken place on the part of [WMC] or the Mortgagor, or, on the part of any other party involved in

the origination of the Mortgage Loan;" (b) "[t]he Mortgage Loan complies with all the terms,

conditions and requirements of [WMC's] Underwriting Standards in effect at the time of

origination of such Mortgage Loan, subject to exceptions thereto made in the ordinary course of

business;" and (c) "[t]here is no default, breach, violation or event of acceleration existing under

the Mortgage or the related Mortgage Note and, to the best of [WMC's] knowledge, no event

which, with the passage of time or with notice and the expiration of any grace or cure period,

would constitute a default, breach, violation or event permitting acceleration; and neither [WMC]

nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration." (*See* Exhibit A, § 3.02(k), (q), (n))

4.      Pursuant to section 3.03 of the Purchase Agreement, WMC agreed to (a) repurchase any Loans affected by a breach of the Representation and Warranties and (b) indemnify UBS and its assignees against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses (collectively, the "Losses") resulting from the breaches of the Representations and Warranties.

5.      The ability of UBS and the investors in the Certificates (the "Certificateholders") to rely upon the truth and accuracy of the Representations and Warranties is a cornerstone of the Securitization.  The Representation and Warranties and the associated remedies were essential to determining the price at which UBS purchased the Loans and, ultimately, the price at which the Trust purchased the Loans.  With this understanding, the parties expressly agreed that if WMC became aware or received notice that the Loans did not have the represented and warranted characteristics and could not be cured of such defect, then WMC would repurchase such Loans and indemnify the Trust for any related Losses.

6.      A loan-level investigation initiated by certain Certificateholders has revealed that WMC breached the Representations and Warranties with respect to numerous Loans in the Securitization, which breaches merit the repurchase of the applicable Loans by WMC and the indemnification by WMC for the resultant Losses suffered by the Trust, in accordance with the Purchase Agreement.  Specifically, the Certificateholders selected two separate samples of Loans, which were reviewed by an independent forensic mortgage loan review firm (the "Forensic Review Firm").

7.      Out of the first sample of 391 Loans by the Forensic Review Firm, 306 – or 78 percent – of those Loans breached the Representations and Warranties, which breaches materially and adversely affect the value of such Loans.  Upon seeing the breach rate in the first sample, an independent statistician was retained to select a statistically valid random sample of 400 Loans.  Out of that sample, the Forensic Review Firm found that 301 – or 75 percent – of the Loans breached the Representations and Warranties, which breaches materially and adversely affect the value of the Loans.  The breaches uncovered by the Forensic Review Firm included, among many others, overstatement of borrower income, understatement of borrower liabilities, and misstatement of the occupancy status of the mortgaged property.

8.      Upon discovering the results of the Forensic Review Firm's  investigation, the Trustee promptly notified WMC of the breaches of the Representations and Warranties and requested that WMC cure the breaches or repurchase the related Loans (the "Defective Loans") within the specified cure period (the "Cure Period").  The Cure Period set forth in the Purchase Agreement is 60 days.  However, WMC failed to cure the identified breaches or repurchase the Defective Loans during the Cure Period.  Following the expiration of the Cure Period, the Trustee demanded that WMC comply with its cure and repurchase obligations set forth in the Purchase Agreement.  WMC did not comply.

9.      The Trust has suffered and will continue to suffer over $70 million in damages as a result of WMC's refusal to comply with its express contractual obligations in connection with the Defective Loans.  Accordingly, the Trustee, on behalf of the Trust, is entitled to specific performance of WMC's repurchase obligation under the Purchase Agreement.  The Trustee, on behalf of the Trust, is also entitled to indemnification from WMC for the Losses, including

money damages, suffered by the Trust as a result of breaches of WMC's Representations and Warranties.

## PARTIES

10.    Plaintiff U.S. Bank is a national banking association with a principal place of business in St. Paul, Minnesota and an office in New York County.

11.    Defendant WMC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Woodland Hills, California.  WMC's sole member is General Electric Capital Corporation, which is, upon information and belief, a corporation organized under the laws of the State of Delaware with its principal place of business in Connecticut.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity between Plaintiff and Defendant, and the amount in controversy exceeds $75,000.

13.    This Court has personal jurisdiction over Defendant because Defendant is registered to do business and has designated a registered agent for service of process in New York.

14.    Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.  Venue is also proper because the properties underlying certain of the Loans are situated in this District.

## FACTUAL ALLEGATIONS

### I.    The Securitization

15.    A mortgage loan securitization is an extensively negotiated structured finance transaction whereby mortgage loans are pooled and deposited into an entity, and serve as

collateral for the issuance by that entity of securities.  The securities pay principal and interest from the cash flow generated by the mortgage loan pool in accordance with specific payment rules that create different slices of risk, known as tranches.  The securities are purchased by investors who are attracted to a particular risk profile represented by a tranche and the mortgage loans relating to such tranche.

16.     The most common form of residential mortgage loan securitization involves the creation of a trust, which purchases a portfolio of mortgage loans and issues certificates.  The trust and trustee hold the mortgage loans for the benefit of the certificate holders, who ultimately bear the economic consequences of the mortgage loans' performance or underperformance.  The value of the mortgage loans (*i.e.*, the price that the trust paid for those loans) and the certificates issued by the trust is directly contingent on the quality of the mortgage loans and the originator's strict compliance with the associated cure, repurchase, and indemnification obligations.

17.     The Securitization was effectuated through this process.  As noted, WMC and UBS entered into the Purchase Agreement, pursuant to which WMC sold the Loans to UBS, made the Representations and Warranties regarding the Loans, and agreed to remedy a breach of the Representations and Warranties by curing the breach in all material respects or repurchasing the affected Loan and indemnifying the Trust from any resultant damages.  In the Purchase Agreement, WMC agreed that "[t]he fact that the [UBS has conducted or has determined not to conduct any partial or complete examination of the Mortgage Files or servicing files shall not affect [UBS's] (or any of its successors') rights to demand repurchase or other relief or remedy provided for" in the Purchase Agreement.  (Exhibit A, § 2.06.)

18.     WMC, UBS, and MASTR then entered into the Assignment Agreement, in which UBS agreed to convey to MASTR all of UBS's right, title and interest in the Loans, which UBS

received through the Purchase Agreement. In the Assignment Agreement, WMC agreed that the Trust, and not UBS, would be the owner of the Loans and that "the Trust (including the Trustee and the Servicer acting on the Trust's behalf) shall have all the rights and remedies available to [UBS], insofar as they relate to the Mortgage Loans, under the Purchase Agreement, including, without limitation, the enforcement of the document delivery requirements and remedies with respect to breaches of representations and warranties set forth in the Purchase Agreement, and shall be entitled to enforce all of the obligations of [WMC] thereunder insofar as they relate to the Mortgage Loans. . . ." (*See* Exhibit B at 1.)

19.     In addition, WMC represented and warranted in the Assignment Agreement, for the benefit of the Trust that, among other things, the Representations and Warranties set forth in Sections 3.01 and 3.02 of the Purchase Agreement were true and correct as of February 27, 2007 and that the remedies available to the Trust in connection with a breach of the Representations and Warranties were as set forth in the Purchase Agreement. (*See id.* at 2.)

20.     Further, under the Assignment Agreement, the parties agreed that "all references to [UBS] (insofar as they relate to the rights, title and interest and, with respect to obligations of [UBS], only insofar as they relate to the enforcement of the representations, warranties and covenants of [WMC]) . . . under the Purchase Agreement insofar as they relate to the Mortgage Loans, shall be deemed to refer to the Trust (including the Trustee and the Servicer acting on the Trust's behalf." (*Id.* at 1-2.) Finally, WMC explicitly acknowledged that MASTR would thereafter transfer the Loans and all rights created by the Purchase Agreement to the Trust, and that the Assignment Agreement "shall inure to the benefit of . . . the Trust (including the Trustee and the Servicer acting on the Trust's behalf)." (*Id.* at 4.)

21.     Pursuant to the PSA, MASTR created the Trust, and the Trust issued the Certificates for which the Loans served as collateral.  In the PSA, MASTR agreed to "transfer, assign, set over and otherwise convey to the Trustee without recourse, for the benefit of the Certificateholders, all the right, title and interest of [MASTR] … in and to the Mortgage Loans … [and] the rights of [MASTR] under the Assignment Agreement . . . ."  (Exhibit C, § 2.01.)

22.     Put simply, the Trust holds the Loans on behalf of and for the benefit of the Certificateholders and stands in the shoes of UBS with respect to the enforcement of WMC's obligations under the Purchase Agreement, including the cure or repurchase and indemnity obligations related to the Representations and Warranties.

**II.    Plaintiff Has The Right To Enforce
WMC's Obligations Under The Agreements**

**A.    WMC's Representations And
Warranties Regarding The Mortgage Loans**

23.     Following the origination and underwriting of the Loans, WMC sought to profit from the sale of the Loans to UBS, and a structure was set up to issue the Certificates, the value of which is contingent on the quality of the Loans.  WMC, through its origination and underwriting activities, had direct access to the detailed information contained in each mortgage loan file and therefore possessed unique knowledge regarding the Loans.  In contrast, investors in the Certificates did not have access to the underlying loan files when the Certificates were issued.

24.     In connection with the sale, WMC guaranteed the quality of the Loans.  WMC's guarantee consisted of three components:  (1) WMC made specific representations and warranties regarding each of the Loans in the pool, (2) WMC agreed to cure or repurchase any Loans that do not conform to its representations and warranties, and (3) WMC agreed to

indemnify the purchaser against any losses and damages resulting from any such defective Loans.

25.    It is apparent that this guarantee provided investors in the Certificates with the comfort and assurance that the Loans were of a certain quality. Consequently, the Certificates derived their value from the veracity of the Representations and Warranties, as well as from the dependability of WMC's contractual obligations. As such, the Representations and Warranties and WMC's cure, repurchase, and indemnification obligations were and continue to be vital components of the Securitization.

26.    The full list of WMC's Representations and Warranties is set forth in Section 3.02 of the Purchase Agreement, (*see* Exhibit A, § 3.02), and Schedule 1 of the Assignment Agreement. (*See* Exhibit B, Schedule 1). The Representations and Warranties include WMC's contractual assurances that:

- No fraud, error, misrepresentation, gross negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of [WMC] or the Mortgagor, or, on the part of any other party involved in the origination of the Mortgage Loan; and

- The Mortgage Loan complies with all the terms, conditions and requirements of [WMC]'s Underwriting Standards in effect at the time of origination of such Mortgage Loan, subject to exceptions thereto made in the ordinary course of business;

- There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note and, to the best of [WMC's] knowledge, no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration; and neither [WMC] nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration.

These are but a few of the numerous Representations and Warranties made by WMC in the Purchase Agreement and the Assignment Agreement.

27.     Accordingly, through the Representations and Warranties, WMC promised that the Loans met certain essential criteria that directly pertained to the quality of those Loans.  It is logical to assume that without the Representations and Warranties, the Securitization would not have occurred or would have only done so on materially different economic terms.

**B.     WMC's Obligation To Cure Breaches Of Its Representations And Warranties Or Repurchase The Defective Loans And Indemnify The Trust Against Any Losses Resulting From The Defective Loans**

28.     Reflecting the significance of the Representations and Warranties, WMC accepted the risk that if any of the Representations and Warranties were breached, WMC itself – not the Trust – would solely bear the consequences of such breach by repurchasing any Defective Loans, if WMC could not cure such breach, and holding the Trust harmless from any Losses caused to the Trust by such breach or the Defective Loans.

29.     Specifically, the Purchase Agreement provides that, "[w]ithin 60 days of the earlier of either discovery by or notice to [WMC] of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans, [WMC] shall use its commercially reasonable efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, [WMC] shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price."  (Exhibit A, § 3.03)

30.     WMC also agreed to "indemnify the Purchaser and Purchaser's agents, employees and subcontractors (including the Purchaser's servicer) and hold them harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from … a breach of the" Representations and Warranties.  (*Id.*)

31.     The parties "understood and agreed that the obligations of [WMC] set forth in … Section 3.03 [of the Purchase Agreement] to cure, substitute or repurchase a defective Mortgage

Loan and to indemnify the Purchaser as provided in … Section 3.03 constitute the sole remedies

of the Purchaser respecting a breach of the foregoing representations and warranties." (*Id.*)

### III.   WMC's Representations And Warranties Contain Breaches That Materially And Adversely Affect The Value Of The Loans

32.     The Forensic Review Firm was retained to perform an investigation of the Loans,

and first examined a sample of 391 Loans.  After observing severe breaches in the initial sample,

a statistically valid random sample of additional 400 Loans was selected.

33.     To conduct the review, the Forensic Review Firm analyzed the files for every

Loan in the samples to confirm the accuracy of legal documents, credit documentation, and the

underwriting decision in relation to WMC stated underwriting standards.  The review examined

the loan files for compliance with the Representations and Warranties, including for any red

flags that should have been caught by WMC in the origination process, such as evidence that

stated income was unreasonable or that the borrower's other mortgage debt was not fully

disclosed.  The Forensic Review Firm then determined whether breaches of the Representations

and Warranties existed.

34.     The Forensic Review Firm found that the Representations and Warranties were

breached on a large scale:  out of the first of 391 Loans, 306 – or 78 percent – of the Loans

breached the Representations and Warranties, which breaches materially and adversely affected

the value of the related Loans.  Out of the statistically valid random sample of 400 Loans, 301 –

or 75 percent – of the Loans breached Representations and Warranties relating to such Loans that

materially and adversely affects the value of the Loans.  On average, the Loans in the sample

contained approximately 5 breaches per Loan.  In all, the Defective Loans have resulted in over

$70 million in damages to the Trust.

35.     The Forensic Review Firm found numerous violations of the Representations and Warranties, which are enumerated in Exhibit D.  These violations include, among many others, the following:

36.     *Overstatement of Income*:  The income of a borrower is directly correlated with the borrower's ability to repay the loan – *i.e.*, the lower the borrower income in relation to a given loan balance, the less likely the borrower will have the ability to repay that loan.  In addition, it is less likely that the borrower will save money for adverse economic conditions.  In other words, lower than expected borrower income reveals that the originator never made a sound determination as to whether the borrower had sufficient financial means to repay the loan and reduces the actual value of the loan on the day that it was purchased by a securitization trust.  If the Trust had known that the income of the borrowers of the Loans was materially less than represented by WMC, it is logical to assume that it would have paid a lower price for the Loans to reflect the higher risk of the underlying Loans or would never have purchased the Loans.  Given the above-described considerations, misrepresentations of borrower income materially and adversely affected the value of the affected Loans.  The following are a few examples of breaches related to borrower income (to protect the confidentiality of the underlying borrower information, the examples in the Complaint do not provide certain data.  However, the breach notices and repurchase demands submitted by the Trustee provided WMC with detailed descriptions of these and other breaches):

- The subject Loan closed on September 6, 2006.  On the loan application, the borrower, a mason, stated his monthly income in 2006 as $4,550, and the co-borrower, a retail manager, stated her monthly income in 2006 as $3,000.  The borrower's 1099 form for 2006, which the borrower submitted to loss mitigation services, sets forth gross annual income of $14,135.75, or $1,177.98 per month.  The co-borrower's W2 form for 2006, which the co-borrower submitted to loss mitigation, sets forth gross annual income of $17,090.87 or $1,424.24 per month.

In total, the income on the application was overstated by approximately 290% – or almost three times – of the actual income.

- The subject loan closed on October 17, 2006. On the loan application, the borrower stated that he was a realtor for a real estate company, with monthly income of $18,000. In May 2011, the Forensic Review Firm contacted the borrower's employer at origination, who verified the borrower's actual 2006 monthly income to be $2,629.54. In light of the borrower and co-borrower's true income, the actual DTI of this Loan is 178.88%, which exceeds the guideline maximum of 50%. In total, the income on the application was overstated by approximately 680% – or almost seven times – of the actual income.

37.     *Understatement of Existing Debt Obligations*: A clear understanding and review of a borrower's existing debt obligations is another key component of loan underwriting. Like misrepresentations of income, misrepresentations of a borrower's existing debt obligations at origination make it less likely that the borrower will be able to repay the loan. Also like income misrepresentations, higher than represented borrower debt obligations demonstrates that the originator never made a sound determination as to whether the borrower had sufficient financial means to repay the loan and reduces the actual value of the loan on the day that it was purchased by a securitization trust. If the Trust had known that borrowers of the Loans were encumbered by other significant debt obligations, it is logical to assume that it would have paid a lower price for the Loans to reflect the higher risk of the underlying Loans or would never have purchased the Loans. Given the above-described considerations, misrepresentations of borrower debt obligations materially and adversely affected the value of the affected Loans. The following are a few of the many examples of breaches related to misrepresentation of debt obligations:

- The subject loan closed on October 5, 2006. The loan application failed to disclose four additional properties that the borrower purchased before or during origination: a property with liens totaling $625,000 and a monthly payment of $4,823, purchased on August 4, 2006; a property with liens totaling $460,000 and a monthly payment of $3,628, purchased on August 10, 2006; a property with liens totaling $470,000 and a monthly payment of $3,151, purchased in October 2006; a property with liens totaling $285,000 and a monthly payment of $2,225, purchased in October 2006. Given that these properties were not disclosed on the

application, the borrower's existing debt obligations were understated by at least $1,840,000, and thus the application portrayed a false picture of the borrower's existing debt obligations.

- The subject loan closed on October 6, 2006. The loan application failed to disclose three additional properties the borrower owned at origination: a property with liens totaling $699,000 and a monthly payment of $2,378, purchased on September 28, 2006; another property purchased on May 16, 2003; and a third property – the borrower's home – which the borrower purchased with three other people. Given that these properties were not disclosed on the application, the borrower's existing debt obligations were understated by at least $699,000, and thus the application portrayed a false picture of the borrower's existing debt obligations.

38. *Debt-to-Income Ratio*: The debt-to-income ratio ("DTI"), or the borrower's monthly debt obligations as compared to his or her monthly income, is a key measure of a borrower's expected ability to repay the loan. The higher the DTI (*i.e.*, the greater the percentage of monthly income a borrower must devote to debt payments), the greater the risk that the borrower will be unable to pay its mortgage loan due to high debt levels. Conversely, a lower DTI allows the borrower to save money for mortgage payments during adverse economic conditions. The DTI is such a delicate metric of the borrower's creditworthiness that a mere 2-3 percentage point change may require re-evaluation of loan approval. WMC set maximum DTI levels for borrowers to qualify for particular loan products and made specific assurances in the Representations and Warranties that such levels would be met. However, in many cases the borrower DTI levels were materially in excess of the specifications of the related Representations and Warranties. If the Trust had known that the DTI of the Loan borrowers violated WMC's underwriting guidelines, it is logical to assume that it would have paid a lower price for the Loans to reflect the higher risk of the underlying Loans or would never have purchased the Loans. Given the above-described considerations, misrepresentations of the DTI

materially and adversely affected the value of the affected Loans.  The following are examples of

the breaches of WMC's DTI representations:

- The Loan lender used gross receipts rather than taxable income to calculate the borrower's income.  Additionally, the loan application did not include the borrower's existing mortgage and lease used to offset the monthly payment on the borrower's rental property.  As a result, the borrower's actual DTI was 282.95%, well above the 55% maximum level permitted under the applicable underwriting guidelines.

- The application overstated the borrower's income, and the Loan lender qualified the borrower using net monthly rental income of $1,035 for a property that the borrower owned and sold two years prior to the subject loan closing.  As a result, the borrower's actual DTI was 84.77%, well above the 50% maximum level permitted under the applicable underwriting guidelines.

39.     *Occupancy Status*: The occupancy type of a mortgaged property indicates how

the mortgage borrower will use the property.  There are generally three types:  owner-occupied,

second home, and non-owner-occupied properties.  A borrower is more likely to pay for the

mortgage loan on the home that that borrower is living in than to pay for a mortgage loan on

property that it is not occupying.  Accordingly, mortgaged properties occupied by the borrower

are less likely to experience payment delinquencies and/or payment defaults than non-owner-

occupied properties.  Therefore, the occupancy type is relevant to analyzing the credit risk profile

of a loan when determining its value.  It is also relevant for prepayment modeling in that, as

compared to owner-occupied properties, borrowers on other occupancy types are more likely to

sell the property in an expanding housing market to lock in profits but typically experience more

difficulty in refinancing due to greater documentation requirements.  However, in many cases

those owner-occupied representations were false.  If the Trust had known that the properties

underlying the Loans were not used as primary residences and/or merely served as investment

properties, it is logical to assume that it would have paid a lower price for the Loans to reflect the

higher risk of the underlying Loans or would never have purchased the Loans.  Given the above-

described considerations, misrepresentations of occupancy status materially and adversely affected the value of the affected Loans.  The following are a few of the many occupancy misstatements among the Defective Loans:

- The subject Loan closed on August 30, 2006 as an owner-occupied property. However, the borrower's driver's license records make clear that the borrower continued to reside at her previous address from January 18, 1999 until at least July 31, 2011.

- The subject Loan closed on October 26, 2006 as an owner-occupied property. However, public records contradict this representation.  For example, according to the borrower's credit records, the borrower continued to reside at the borrower's previous address from February 7, 2005 until at least February 28, 2011.  This conclusion is supported by the mailing address of the borrower's bank statements. Further, the appraisal report in the loan file indicates that the property was an investment property.  To this end, public records disclosed that the subject property was listed as a Section 8 rental property and occupied by a tenant.

40.    In each of the Defective Loans, the understatement of income, the overstatement of liabilities, the failure to meet key underwriting ratios and the misstatement of occupancy status each breached the Representations and Warranties.  These breaches materially and adversely affected the value of the Defective Loans because, among other things, they overstated the Loans' quality as of the date the Defective Loans were purchased by the Trust.  Had the Trust known the true quality of the Defective Loans – including correct (non-inflated) borrower income, actual (not understated) existing debt, true (not manipulated) LTV and CLTV ratios, true (not manipulated) DTI, and verified (not false) occupancy status – as well as the fact that WMC did not follow its own underwriting guidelines in originating the Loans, it is logical to assume that the Securitization would have been outright rejected or negotiated on fundamentally different economic terms.

41.    In light of the recent public revelations regarding WMC's originating violations and the findings of the Forensic Review Firm, on or about February 27, 2007 – the date that the

Securitization closed and the date that WMC restated the Representations and Warranties -- the Trust unknowingly overpaid for the Loans.  Indeed, the breaches in the Defective Loans make clear that WMC completely disregarded the Representations and Warranties; showed little, if any, concern, for a borrower's ability to repay; and followed few, if any, objective standards or criteria in the origination and underwriting the Loans in accordance with its Representations and Warranties.  If the true condition of the Loans was known, or if the Trust knew that WMC would refuse to perform its express contractual obligations to cure the breaches or repurchase the Loans and indemnify the Trust in accordance with the Purchase Agreement, it is logical to assume that WMC would have been unable to sell the Loans to the Trust or would have sold the Loans for significantly less than $900 million.

## IV.    WMC's Refusal To Comply With
##        Its Express Contractual Obligations

42.    Upon learning the results of the Forensic Review Firm's examination, the Trustee promptly sent notice of the breaches to WMC on November 9, 2011 and November 30, 2011, demanding that WMC cure the breaches or repurchase the Defective Loans within the Cure Period.

43.    WMC's Cure Period for those notices expired on January 9, 2012 and January 30, 2012, respectively.  However, WMC failed to cure or repurchase any of the Defective Loans during the Cure Period and refused to recognize the Trustee's notices as sufficient to trigger the Cure Period.

44.    Instead, WMC attempted to circumvent its contractual obligations by providing baseless rebuttals of some of the cited breaches without recognizing its obligation to cure or repurchase even one Defective Loan.  WMC's rebuttals not only failed to address all of the breaches identified by the Trustee, but they do not comport with the explicit terms or the spirit of

the Purchase Agreement, which provides no discretion for WMC to contest the Trustee's breach findings and cure and repurchase demands.

45.     On March 6, 2012, following the expiration of the Cure Period, the Trustee demanded that WMC comply with its cure and repurchase obligations under the Purchase Agreement.  In response, WMC continued to disregard its express obligations.

46.     WMC's inaction is consistent with WMC's general refusal to comply with its repurchase obligations with regard to the Trust.  According to a February 13, 2012 Asset-Backed Securitizer Report ("ABS Report") filed by UBS, which, among other things, provides the repurchase statistics for the Trust, WMC has honored 0 out of the 700 repurchase requests that WMC has received for the Loans in the Trust.  (A true and correct copy of the ABS Report is attached hereto as Exhibit E)

## FIRST CAUSE OF ACTION

### Breach of Contract/Specific Performance

47.     The Trustee incorporates by reference the allegations set forth in paragraphs 1 through 46, inclusive, of this Complaint as though set forth fully herein.

48.     WMC has breached its Representations and Warranties set forth in the Purchase Agreement and the Assignment Agreement.  The Purchase Agreement and the Assignment Agreement are valid and enforceable contracts that give rise to certain obligations on the part of WMC with respect to the Representations and Warranties made in connection with the sale and transfer of the Loans into the Trust.

49.     On November 9 and November 30, 2011, the Trustee sent notices to WMC of Representation and Warranty breaches that materially and adversely affect the value of the Defective Loans and notified WMC of WMC's obligation to cure those breaches or repurchase the Defective Loans.

50.     Over 60 days have passed since WMC was notified of its Representations and Warranties breaches, but WMC has failed and refused, and continues to fail and refuse, to cure the breaches or repurchase the Defective Loans.

51.     On March 6, 2012, after the expiration of WMC's Cure Period, the Trustee demanded that WMC comply with its express contractual obligations set forth in the Purchase Agreement.  WMC has not complied.

52.     The Trustee is entitled to specific performance of WMC's repurchase obligations under the Purchase Agreement.  Specific performance is required because the Purchase Agreement specifically requires the repurchase of any Loan(s) that breach the Representations and Warranties in a manner that materially and adversely affects the value of such Loan(s).

53.     The Trustee has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the subject contracts. Accordingly, the Trustee is entitled to specific performance of WMC's contractual obligation to repurchase the Defective Loans in the Trust.

## SECOND CAUSE OF ACTION

### Indemnification/Damages

54.     The Trustee incorporates by reference the allegations set forth in paragraphs 1 through 53, inclusive, of this Complaint as though set forth fully herein.

55.     WMC has breached its Representations and Warranties set forth in the Purchase Agreement and the Assignment Agreement.  The Purchase Agreement and the Assignment Agreement are valid and enforceable contracts that give rise to certain obligations on the part of WMC with respect to the Representations and Warranties made upon its sale of the Loans to the Trust.

56.     In particular, in the Purchase Agreement, WMC agreed to indemnify and hold harmless the Trust against any Losses, including damages, resulting from a breach of the Representations and Warranties.

57.     The Trustee has discovered breaches of the Representations and Warranties, which breaches materially and adversely affect the value of the Loans.

58.     On November 9 and November 30, 2011, the Trustee notified WMC of Representation and Warranty breaches that materially and adversely affect the value of the Defective Loans.

59.     Over 60 days have passed since WMC was notified of its Representations and Warranties breaches, but WMC has failed and refused, and continues to fail and refuse, to cure the breaches or repurchase the Defective Loans.

60.     On March 6, 2012, after the expiration of WMC's Cure Period, the Trustee demanded that WMC comply with its express contractual obligations set forth in the Purchase Agreement.  WMC has not complied.

61.     As a direct result of WMC's breaches of the Representation and Warranties, the Trust has suffered over $70 million in damages.

62.     The Trustee has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the subject contracts.  As noted above, the Trust is entitled to indemnification under the Purchase Agreement for any Losses, including damages, caused to the Trust by a breach of the Representations and Warranties.  Accordingly, the Trustee is entitled to recover money damages caused to the Trust by the Defective Loans, which damages are no less than $70 million.

## PRAYER FOR RELIEF

WHEREFORE, judgment should be entered in favor of Plaintiff and against the

Defendant as follows:

(a)      On the first cause of action, for the specific performance of WMC's obligations

under the Purchase Agreement to repurchase the Defective Loans in the Trust;

(b)      On the second cause of action, an award of damages against WMC for

compensatory damages in an amount to be determined at trial but likely in excess of $70 million;

(d)      For prejudgment interest at the maximum legal rate; and

(e)      For any such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
       May 4, 2012

Respectfully submitted,

KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP

By: _____
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Michael M. Fay (mfay@kasowitz.com)
Uri A. Itkin (uitkin@kasowitz.com)
1633 Broadway
New York, NY 10019
(212) 506-1700

*Attorneys for Plaintiff*